NICHOLAS GENOVESE, ADMR.

*vs.*

LUCY MONTANO ET AL.

SALVATORE GENOVESE

*vs.*

LUCY MONTANO ET AL.

Superior Court      New Haven County      File No. 57465, 58144

MEMORANDUM FILED APRIL 5, 1940.

*Thomas R. FitzSimmons,* of New Haven, for the Plaintiffs.

*Frank S. Bergin,* of New Haven, for the Defendants.

SIMPSON, J.   On and some years prior to February 19, 1939, the named defendant and the defendant Salvatore Macchiaroli, were the owners of the premises situated at corner of York and Oak Streets in New Haven.   For the purposes of this memorandum it is considered that the premises are bounded on the north by Oak Street and on the east by York Street.   When acquired by the defendants there were two buildings on the premises, which were separted by a passageway.   At this time the most northerly building, which was located on the corner proper, was arranged for a store on the ground floor, and for accomodations for two families, living separately, on the second and third floors.   It did not at that time come within the meaning of a tenement house as defined by the statute.   The most southerly building was arranged for a store or stores on the

ground floor and for accomodations for three families on the second and third floors, and therefore came within the statutory definition of a tenement house. The two buildings were substantially the same for many years and so remained until the major alterations were made on the buildings as hereinafter stated. The plaintiff Salvatore Genovese and his deceased wife, Anna Genovese, had occupied a tenement on the second floor of the most southerly building for many years, and when the alterations were made they moved to a tenement on the third floor, which they occupied until the fire occurred as hereinafter stated.

In the spring of 1936, the defendants caused major alterations to be made in the buildings. They caused a brick wall to be constructed along the York Street side of the two buildings, extending to the floor of the second story of the most northerly building and to the floor of the third story of the most southerly building. From this wall, a flat roof was constructed to the most southerly building, and connected therewith just below the windows of the Genovese tenement. The entire first floor of the two buildings was converted into a restaurant. The second floor of the most southerly building was converted into a bar room and kitchen. The passageway between the buildings was closed as high as the third floor of the buildings. The second floor was reached by an entrance and stairway leading from the York Street side of the most southerly building to a hall on that floor. There was likewise an entry and stairway from the rear of this building to this hallway. From this hallway a passageway or hallway was constructed through to the most northerly building. When this was completed the two buildings were in effect one building, and so arranged as to provide living accommodations for three families living separately on the second and third floors, and it would seem that as altered the building became a tenement house within the definition of the statute.

From the hallway on the second floors there was an enclosed stairway which led to a hallway on the third floor, on which the Genovese apartment was located. This was the only mode of ingress or egress from the third floor. At the time of the alterations there was a fire escape in the rear of the most northerly building. This fire escape extended up to a window of the second floor, and under the direction of the then city building inspector, was extended so as also to take in a window of the bar room on that floor.

On the morning of February 19, 1939, two fires occurred in the building. Both of these fires were in all probability of an incendiary origin, and so far as appeared without fault on the part of either defendant. One fire was in the cellar and under the northeastern corner of the restaurant. This fire did not burn through the floor and no claim is made by the plaintiffs with reference thereto. The other fire occurred in the entry way or lobby from York Street to the restaurant. This fire spread throughout the restaurant, and did considerable damage to the draperies, decorations, side walls and the stairway leading from the entry or lobby to the bar room above and to some portions of the ceiling, but did not burn through the ceiling of the restaurant. There were no partitions going to the third floor from the restaurant proper. There was a partition on the northerly wall of the bar room and kitchen which had been reconstructed when the alterations were made. This partition was not burned. There was no burning on the second floor nor on the third floor, except some wood around the bar and the back bar was charred. There was no burning in the third floor. There was a doorway from the kitchen to the hall on the second floor. So far as appears this doorway was closed at the time of the fire. The fire created a dense smoke, which spread throughout the restaurant, bar and kitchen, into the halls on this second and third floors and into the Genovese apartment. Smoke also went up from the ground floor or lobby between the outside and inside wall at the south side of the building and came out under the corner eaves of the building, but it did not appear this smoke did or could enter the Genovese apartment. This apartment faced York Street. This apartment consisted of the three most westerly rooms of the third floor. All the partitions, walls and floor of the apartment as well as the ceiling beneath were intact after the fire and afforded no ingress for the smoke.

The fire was first discovered by one George Peloso who lived in the building next south of the building in question. On arising to go to the bathroom he saw some smoke coming out near where the two buildings joined. He awoke his parents, and called his brother who went out and rang a fire alarm. The alarm was received at 5:23 a.m. The fire department responded immediately, and arrived at the scene of the fire within three or four minutes. After arrival the firemen directed their attention for a few minutes quenching the fires in the cellar and restaurant, and after about fifteen minutes two

firemen who were in the rear, after being told some people were in the third floor, went in the rear door and up the flights of stairs to the third floor and into the Genovese apartment. They encountered dense smoke on the stairways and in the apartment. After a brief survey the deceased Anna Genovese was found in her nightdress lying over the edge of the bed. She was unconscious and was immediately taken out and sent to the hospital and was found to be dead on arrival at 5:55 a.m. Salvatore Genovese was found on the floor in an unconscious state, and immediately taken to the hospital, where he was admitted at 6 a.m. in an unconscious state. He regained consciousness during the day. Anna Genovese died of carbon monoxide poisoning, and Salvatore was suffering from the effects of smoke or gas, or both.

The plaintiffs claim that the proximate cause of Anna Genovese's death, and the partial suffocation of Salvatore and his subsequent suffering therefrom, was the failure of the defendants to provide a fire escape from and to the third floor apartment as required by statute. Whether or not the absence of a fire escape was the proximate cause of the death of Anna and injuries to Salvatore is a question of fact. *Pauley vs. Steam Gauge & Lantern Co.*, 131 N.Y. 90, 15 L.R.A. 194, and note; *Arnold vs. National Starch Co.*, 194 N.Y. 42; *Friedman vs. Shindler's Prairie House*, 224 App. Div. (N.Y.) 232; *Weeks vs. McNulty*, 101 Tenn. 495.

The testimony in this case conclusively established the fact that Anna Genovese was overcome while asleep, and that Salvatore, when aroused in a half conscious state, put on his pants and went into the kitchen to see if the smoke came therefrom. While in the kitchen he said he tried to raise a window, but that he could not do so. Whether this was due to the condition of the window or from his own weakness did not definitely appear, but from his description of his condition it was more likely due to the latter. At any rate he turned back into the bedroom to look for his wife, and collapsed on the floor, where the firemen found him. A fire escape in the rear of the house would have been unavailing because neither tried or could have gotten to it. The plaintiffs claim that there should have been a fire escape in front of the house up to the flat roof, in front of the windows of the apartment. This flat roof was flush with the building just below the window sills of the apartment, and to get to the fire escape, if in front of the building,

they would have had to open a window of their bedroom and step out onto the flat roof. If this had been done this catastrophe would have been avoided in any event. But there was no attempt to escape by the window to the flat roof. If there had been a fire escape there it would have been unavailing; consequently, the absence of a fire escape there cannot be said to be the proximate cause of the death of Anna Genovese or of the injuries to Salvatore. This is in line with the cases above cited, especially the *Pauley* and *Weeks* cases, and others.

It is evident that the proximate cause of Anna's death and Salvatore being overcome was the rapidity with which the smoke and gas spread throughout the building. The plaintiffs claim that this was due to the building, when altered, not being made to conform to the building regulations for wooden tenement houses and to faulty construction. No definite violation has been pointed out which would have prevented or retarded the spreading of the gas and smoke to the apartment. It is claimed that its spread was due to lack of fire stops in the partitions. Whether there was a lack of fire stops in the partitions is not definitely shown. Besides, the partitions around the apartment began on that floor, and were closed by the ceiling of the second floor. They were intact after the fire. The ceiling below the apartment was made of plasterboard and cement, which was intact and without any holes therein after the fire.

It is in evidence that the stairways leading to the second floor were full of smoke and gas, also the hallway and stairway leading to the third floor. It is more probable that the smoke and gas spread through and under or around doorways into the stairways and halls and thence in like manner into the stairway of the third floor and into the apartment, than in any other manner. That the spread of smoke and gas was due to faulty or improper construction of the building would be a surmise and conjecture. The alterations were planned by a competent architect. While the plans were departed from in some minor details, the work was performed by a competent contractor, and the work was inspected almost daily by the building inspector or his assistant. While a neglect or failure of the building inspector to have the alterations properly made would be no defense, the above facts afford a reasonable inference that the work was in fact properly done.

It is suggested that it was a violation of the law to have a

bar and kitchen on the second floor of this building. If this is true, the fire did not start in either, nor can the violation of law, if any, be found to be the proximate cause of the fire, nor the proximate cause of the death of Anna or of the injuries to Salvatore.

I am unable to find from the evidence that the proximate cause of Anna's death and injuries to Salvatore was the lack of a fire escape to the third floor, or violation of fire regulations or faulty construction and consequently have to render judgment for the defendants in both cases, which is done.